25 A.3d 1027

KENT MOTOR CARS, INC., D/B/A HONDA OF PRINCETON, SPORTS AND SPECIALIST CARS, INC., AND ROBERT BURT, PLAINTIFFS–RESPONDENTS AND CROSS–APPELLANTS, v. REYNOLDS AND REYNOLDS, CO., DEFENDANT–APPELLANT AND CROSS–RESPONDENT, AND NEW JERSEY COALITION OF AUTOMOTIVE RETAILERS, INC., AND AUTOMATIC DATA PROCESSING, INC., DEFENDANTS, AND UNIVERSAL UNDERWRITERS GROUP, DEFENDANT–CROSS–RESPONDENT.

Argued October 13, 2010—Decided May 18, 2011.

430

*Keena Mackay Hausmann* argued the cause for appellant and cross-respondent (*Latham & Watkins,* attorneys; *Ms. Hausmann, Joan E. Karn,* and *Mark S. Mester,* a member of the Illinois bar, of counsel and on the briefs).

*Jeffrey M. Pollock* argued the cause for respondents and cross-appellants Kent Motor Cars, Inc., d/b/a Honda of Princeton, Sports and Specialist Cars, Inc., and Robert Burt (*Fox Rothschild,* attorneys; *Mr. Pollock* and *Jonathan D. Weiner,* of counsel; *Mr. Pollock* and *Joel M. Ferdinand,* on the briefs).

*John S. Fetten* argued the cause for cross-respondent Universal Underwriters Group (*Montgomery, Chapin & Fetten,* attorneys).

Justice HOENS delivered the opinion of the Court.

These consolidated appeals present this Court with two discrete questions that have arisen as a result of separate, but related, litigation among the parties. The first of those two questions arose in the context of a dispute between a group of car dealers

and a company that supplied the dealers with preprinted forms to be used when selling cars to customers. That dispute raises issues about the meaning and intent of the party joinder rule that was adopted as part of the evolution of our Entire Controversy jurisprudence. More specifically, it requires this Court to address the scope of sanctions that our trial courts are authorized to impose for violations of the party joinder rule and the circumstances in which imposition of those sanctions is appropriate.

The second dispute also involves the car dealers, but relates to the extent of insurance available to them under their "Statute and Title Errors and Omissions" (STEO) coverage. In resolving that dispute, we address the meaning of the policy's coverage for violations of "truth-in-lending or truth-in-leasing" laws in the context of the claims made against these car dealers by their customers for having charged inflated fees for securing title documents.

## I.

Although there are some facts that are relevant to both aspects of this appeal, the legal analysis is entirely separate. We begin, therefore, with the facts that are relevant to the party joinder claims.[1]

## A.

Plaintiff Kent Motor Cars, Inc. is an automobile dealer doing business as Honda of Princeton, an entity that primarily sells, leases, and services Honda vehicles. Plaintiff Sports and Specialist Cars, Inc. is an automobile dealer that primarily sells, leases, and services Saab vehicles. Plaintiff Robert Burt is an individual who has an ownership interest in the two dealerships and who also serves as the general manager of Honda of Princeton. For

---

[1] The factual allegations concerning the insurance coverage claim against defendant Universal Underwriters Group and the relationship of that claim to the party joinder dispute are set forth in Section I.B., *infra*.

purposes of these appeals, there are no distinctions to be drawn among these corporate and individual plaintiffs, as a result of which we refer to them collectively as the Dealerships.

Defendant Reynolds and Reynolds Company is a consulting and management-support firm that provides a variety of goods and services to automobile dealers and manufacturers. Included among the goods and services it sells to automobile dealers are pre-printed forms used in connection with motor vehicles sales. During the timeframe that is relevant to this dispute, the Dealerships purchased "Buyer's Order" forms from Reynolds.

Although the issues before this Court relate directly to the contractual and business relationships between the Dealerships and Reynolds, the dispute between the parties finds its roots in an earlier class action litigation brought by others against the Dealerships. As such, a brief explanation of the facts and the procedural history of that earlier matter is an essential underpinning for the dispute now before this Court.

In 2003, Henry Wilson, personally and as the representative of a putative class, sued the Dealerships (the *Wilson* action), alleging that the Dealerships had violated the Consumer Fraud Act (CFA), *N.J.S.A.* 56:8–1 to –20, and the Truth–in–Consumer Contract, Warranty and Notice Act (TCCWNA), *N.J.S.A.* 56:12–14 to –18. The *Wilson* complaint was based on three specifically-alleged violations: (1) overcharging customers and failing to disclose license, title, and registration fees; (2) charging a deceptive and misleading "Documentary Fee" that included charges for services that were not performed or the value of which was inflated; and (3) utilizing a form in which a required notice about fees was printed in a font size smaller than that required by the applicable regulation.

From the outset of the *Wilson* action, the Dealerships knew that the third claim, asserting a regulatory violation based on the font size of the forms being used, referred to the "Buyer's Order" forms they had purchased from Reynolds. The specific allegation in the *Wilson* complaint relating to the Reynolds form was that

the language advising automobile purchasers about their right to be given itemized prices for each pre-delivery service and documentary service was not sufficiently prominent, and that it therefore violated two Motor Vehicle Sales Practices (MVSP) Regulations in effect at the time the *Wilson* plaintiffs purchased cars from the Dealerships. *See N.J.A.C.* 13:45A–26B.2(a)(1)(iii), – 26B.2(a)(2)(iii).[2] That language, in relevant part, advised as follows:

> YOU HAVE THE RIGHT TO A WRITTEN ITEMIZED PRICE FOR EACH SPECIFIC DOCUMENTARY AND PRE DELIVERY SERVICE WHICH IS TO BE PERFORMED. THE AUTOMOTIVE DEALER MAY NOT CHARGE FOR PRE-DELIVERY SERVICES FOR WHICH THE AUTOMOTIVE DEALER IS REIMBURSED BY THE MANUFACTURER.

Not long after the *Wilson* complaint was filed, the Dealerships were advised by the New Jersey Coalition of Automotive Retailers (NJCAR), a trade association to which the Dealerships belonged, that the font size on the Reynolds form was smaller than the regulations required. In spite of their knowledge that one of the three claims upon which the *Wilson* plaintiffs relied to support their CFA claim rested on the Reynolds form, the answer that the Dealerships filed and served in *Wilson* did not identify Reynolds as a party that was potentially liable and therefore should be joined as required by *Rule* 4:5–1(b)(2). Moreover, the Dealerships made no effort to assert a claim against Reynolds in the *Wilson* action.

---

2 The MVSP regulations specified in the *Wilson* complaint and germane to the claims against Reynolds required that consumers of automobiles be informed, through the use of specific language set forth in "ten-point bold face type," of their right to itemized prices for pre-delivery services, *N.J.A.C.* 13:45A–26B.2(a)(1)(iii), and documentary services, *N.J.A.C.* 13:45A–26B.2(a)(2)(iii). After the filing of both the Wilson complaint and the complaint in this action, amendments to the regulations were proposed, *see* 40 *N.J.R.* 2213(a) (May 5, 2008), and adopted, *see* 41 *N.J.R.* 2138(a) (May 18, 2009), to eliminate the notice requirements in favor of the obligation to itemize the charges for pre-delivery services, *N.J.A.C.* 13:45A–26B.2(a)(2), and documentary services, *N.J.A.C.* 13:45A–26B.3(a)(2). Notwithstanding these amendments, for the purposes of this opinion, we address the MVSP regulations as they existed prior to the amendments.

The *Wilson* action proceeded for two more years until the trial court, in June 2005, granted partial summary judgment in favor of the *Wilson* plaintiff class. The court's Order identified the over-charges and the regulatory violation arising from the form's inadequate font size as its bases for granting relief. Immediately after the grant of partial summary judgment, the parties in *Wilson* began settlement discussions. At about that time, the Dealerships retained new counsel to represent them and it was the new attorney who first raised an issue about whether Reynolds should be participating in the *Wilson* action. In particular, in the context of extending a settlement offer to the *Wilson* plaintiffs late in August 2005, the new counsel for the Dealerships wrote:

> Reynolds & Reynolds probably should have been imple[a]ded into this action and we intend upon doing so shortly. Our commitment to settling this matter in part hinges upon your commitment that plaintiffs [the class members] will consent to our imple[a]ding Reynolds & Reynolds (although frankly, I'd rather litigate against them in an independent action but may be required to bring them in as a third-part[y] defendant as a result of whatever is left of the entire controversy doctrine.)

The attorneys representing the *Wilson* plaintiffs had several responses to the question of participation by Reynolds. In short, the *Wilson* plaintiffs argued that the issue should have been raised far earlier, that adding Reynolds as a party would "drastically change[ ] our position regarding settlement," and that they "would seek that additional cash to be paid directly to class members" if the Dealerships secured a contribution from Reynolds based on the inadequate font size.

Rather than implead Reynolds, the Dealerships proceeded with their settlement negotiations, eventually agreeing in principle to the terms of a settlement with the *Wilson* plaintiffs on September 16, 2005. As soon as that agreement had been made, the Dealerships filed their complaint against Reynolds [3] in this case. The complaint alleged that the notice of the buyer's right to written

---

[3] The original complaint in this matter also named NJCAR as a defendant, alleging that the Dealerships purchased forms from that entity that failed to comply with the regulations. The claims against NJCAR were withdrawn after NJCAR demonstrated that its forms complied with the regulations.

itemized prices for each pre-delivery and documentary service in the "Buyer's Order" forms purchased from Reynolds violated the font-size requirement, *see N.J.A.C.* 13:45A–26B.2(a)(1)(iii), – 26B.2(a)(2)(iii), and therefore gave rise to one of the *Wilson* claims as to which the court had granted summary judgment. The Dealerships demanded that Reynolds indemnify them for all of their costs and losses in the *Wilson* action, together with interest and counsel fees. Moreover, the Dealerships demanded that all of those damages be trebled pursuant to the CFA. Unlike their first-filed pleading in *Wilson*, the Dealerships included in the complaint in this action the required certification, *see R.* 4:5–1(b)(2), advising that the "matter in controversy" was related to the then-still-pending *Wilson* action. Reynolds filed its answer to the complaint in this matter on November 28, 2005, but did not attempt to intervene in *Wilson*.

A formal settlement agreement in the *Wilson* action was executed on November 8, 2005, and approved by the trial court, *see R.* 4:32–2(e)(1)(A), in March 2006. On June 12, 2006, the court entered final judgment in the *Wilson* action. Neither the settlement nor the final judgment in *Wilson* undertook to apportion the agreed-upon settlement amounts among the various claims that the *Wilson* plaintiffs had raised.

In December 2007, Reynolds moved for summary judgment in this matter, arguing that the failure of the Dealerships to comply with *Rule* 4:5–1(b)(2) in the *Wilson* action barred them from any recovery. The trial court granted that motion, expressing its reasoning in a lengthy written opinion. The court analyzed three key questions, considering whether the complaint was a "successive action," whether the Dealerships' failure to comply with the *Rule* was inexcusable, and whether Reynolds had been "substantially prejudiced" by the Dealerships' failure to comply with the notice requirements imposed by the *Rule*. Because only the last of these three elements remains a matter of dispute, we limit our description of the trial court's reasoning to its discussion of substantial prejudice.

In concluding that Reynolds had suffered substantial prejudice, the trial court noted that the judge who presided in *Wilson* had based his order granting partial summary judgment against the Dealerships on the finding that the Reynolds "forms were printed in 7.5—as opposed to 10—point font, and were therefore legally deficient under *N.J.A.C.* 13:45A–26B.2(a)(2)(iii)." The trial court noted that the Dealerships had deprived Reynolds of "a reasonable opportunity to be heard on [that] issue" and that Reynolds would be prejudiced if required to "contend with the precedential effect of [the *Wilson* court's] decision" in defending this action. The trial court concluded that it would be "impossible to know what effect participation by Reynolds might have had on those findings, or how a different disposition of the summary judgment motion in the *Wilson* matter might have altered the outcome of settlement negotiations, [therefore creating] substantial prejudice as a result of the Dealerships' noncompliance" with the *Rule*.

Moreover, the trial court noted that the Dealerships were attempting to deprive Reynolds of any fair opportunity to defend itself on the merits of the claims by trying to recover the entire *Wilson* settlement when they had elected not to allocate that sum across the three claims that had been made by the class members. As the trial court commented, "Reynolds is now faced with the task of relitigating liability and plumbing settlement negotiations, to which it was not a party, in order to determine what portion of the final settlement was attributable to its allegedly deficient forms."

Further, the trial court found that the loss of both documentary and testimonial evidence from which Reynolds might have been able to defend or might have been able to make a fair allocation created substantial prejudice. In particular, because the Dealerships had purged computer files of e-mails generated during the settlement process, the court expressed a concern that the Dealerships not be allowed to profit from a loss of evidence that was entirely of their own making.

Finally, the court pointed out that by pursuing piecemeal litigation through their violation of the *Rule*, the Dealerships were attempting to substantially increase their claim for damages, creating the very real potential that they would recoup a windfall, resulting in a profit. That is, by characterizing their claim against Reynolds as one falling within the CFA rather than one for contribution, the Dealerships were attempting to treble damages already trebled. Taken together, these four concerns created the substantial prejudice on which the trial court relied in granting the Reynolds motion.

### B.

In May 2006, by leave granted, the Dealerships filed an amended complaint which asserted claims against their insurer, defendant Universal Underwriters Group.[4] The Dealerships contended that they were entitled to both a defense and indemnity against the class action claims based on a series of insurance policies that were in force during the time periods at issue in the *Wilson* action.

Late in 2007, the Dealerships and Universal cross-moved for summary judgment on the insurance coverage claims. Those dispositive motions rested on two[5] claims, referred to by the parties as Statute and Title Errors and Omission (STEO) and

---

[4] The amended complaint also asserted claims against an entity known as Automatic Data Processing, Inc., and further amended complaints substituted ADP, Inc. Dealer Services Group as the correct name of Automatic Data Processing, Inc., and added claims against NJ Car Services, Inc. Eventually, the Dealerships stipulated to the dismissal of the claims against all of these parties and NJCAR, which had been a defendant from the outset.

[5] In its petition for certification, the Dealerships assert that their complaint's third coverage claim, resting on the policies' Employee Dishonesty Protection, was improperly dismissed by the trial court and that it was inappropriately overlooked on appeal. Because the Dealerships did not include either a claim relating to that coverage in their questions presented or any substantive arguments that would assist this Court in addressing how any of their factual allegations might constitute "employee dishonesty" as defined by their insurance policies, we do not consider this claim.

Customer Complaint Defense (CCD) coverage. The latter coverage was for a fixed amount that Universal paid in full to each of the dealerships, leaving only the STEO coverage in issue before this Court. The STEO coverage was defined by the policy to be limited, in relevant part, to the defense and indemnification relating to:

any claim or SUIT filed against YOU, . . . by or on behalf of:

(a) a customer arising out of GARAGE OPERATIONS, because of an alleged violation during the Coverage Part period, of any federal, state or local:

. . . .

(2) truth-in-lending or truth-in-leasing law.

When the Dealerships moved for summary judgment, seeking coverage for the *Wilson* claims under the STEO clause, Universal argued that the STEO coverage was not applicable to the claims in the *Wilson* litigation because that complaint did not assert violations of state or federal truth-in-lending or truth-in-leasing laws. In a detailed written opinion, the trial court agreed. The trial court reasoned that all of the claims in the *Wilson* litigation arose under the CFA, the TCCWNA, and the MVSP regulations and that none of those claims was based on a "truth-in-lending" or "truth-in-leasing" law.

The trial court analyzed numerous arguments raised by the Dealerships relating to both the duty to defend and the duty to indemnify, rejecting each in turn. As it relates to the STEO claims, the court reasoned that although some of the members of the *Wilson* class had engaged in leasing transactions, none of the claims asserted violations of federal, state, or local truth-in-lending or truth-in-leasing laws. In doing so, the trial court rejected the assertion by the Dealerships that the CFA, TCCWNA, and MVSP regulations share the "same objectives" as the federal Truth–in–Lending Act (TILA), the federal Consumer Leasing Acts, or their state counterparts sufficient to bring the complaint within the STEO coverage.

Finally, the trial court considered, and rejected, the argument by the Dealerships that Universal was estopped to deny entitlement of its insureds to a defense or indemnity under the STEO

coverage based on its election to provide a defense pursuant to the CCD coverages, pointing out that the insurer at all times had proceeded pursuant to its reservation of rights.

## C.

Following the trial court's grant of summary judgment in favor of both Reynolds and Universal, the Dealerships appealed. In a published opinion, the Appellate Division reversed the judgment in favor of Reynolds, but affirmed the dismissal of the coverage claims against Universal. *Kent Motor Cars, Inc. v. Reynolds & Reynolds Co.*, 412 *N.J.Super.* 1, 14, 15–16, 988 *A.2d* 594 (App.Div. 2010).

Regarding the claim against Reynolds, the Appellate Division first traced the development of the Entire Controversy Doctrine, analyzing its expansion over time and the eventual adoption of *Rule* 4:5–1(b)(2) in response to criticisms that arose relating to party joinder. *Kent, supra,* 412 *N.J.Super.* at 8–11, 988 *A.2d* 594. The court explained the limits embodied in the *Rule* concerning party joinder and its enforcement, noting that

under the final sentence of *R.* 4:5–1(b)(2), a court may not dismiss a subsequent action based on a party's failure to comply in a prior action with the notice requirements of the rule unless it finds that: (1) the action is a "successive action;" (2) the failure to provide notice of other potentially liable parties was "inexcusable;" and (3) the undisclosed party's right to defend the successive action has been "substantially prejudiced" by that failure.

[*Kent, supra,* 412 *N.J.Super.* at 11, 988 *A.2d* 594.]

In addressing the issues raised on appeal, the court found it necessary to decide only that Reynolds could not demonstrate that it was "substantially prejudiced" by the Dealerships' violation of the *Rule. Id.* at 11–12, 988 *A.2d* 594. In doing so, the court rejected all of the arguments raised by Reynolds that the trial court had found persuasive. *Id.* at 13–14, 988 *A.2d* 594. First, the court noted that Reynolds will not be bound by the finding of the *Wilson* judge that its form in fact violated the applicable regulation. *Id.* at 13, 988 *A.2d* 594. Second, the court noted that the Dealerships will have the burden of proving damages, which

will overcome Reynolds' argument that excluding it from *Wilson* will preclude it from attempting to limit the allocation of damages. *Id.* at 13–14, 988 *A.*2d 594. Finally, the court concluded that any prejudice to Reynolds caused by the loss or destruction of evidence can be addressed, if appropriate, through the familiar mechanisms available to address any act of spoliation. *Id.* at 14, 988 *A.*2d 594. In light of its conclusion that the Reynolds claims of prejudice fell short of the level required in the *Rule* for imposition of dismissal, the appellate panel reversed the trial court's grant of summary judgment in favor of Reynolds. *Ibid.*

The second aspect of the appeal brought by the Dealerships rested on its claims against Universal for defense and indemnity. Because the full amount of the CCD coverage had been paid to each of the Dealerships, the Appellate Division focused on the STEO claims. *Ibid.* The panel began by noting that all of the statutes and regulations that formed the basis of the *Wilson* complaint are "general consumer protection laws rather than statutes and regulations directed specifically at truth-in-lending or leasing." *Id.* at 15, 988 *A.*2d 594. The panel pointed out that all of the claims in *Wilson* related to excessive title, registration, and documentary fees; to fees charged for services never performed; and to the failure of the dealers to use the correct font size when informing customers about their rights to itemized prices for those services. *Ibid.* Because none of those claims related to leasing or financing, the *Wilson* complaint did not raise a claim that fell within the STEO coverage. *Ibid.* Moreover, the appellate panel, agreeing with the trial court, rejected the alternative estoppel-based argument. *Id.* at 16, 988 *A.*2d 594. Because the insurer's agreement to provide a defense pursuant to the CCD coverage was premised on a reservation of all of the insurer's rights, the panel concluded that Universal was not estopped to deny coverage pursuant to the STEO provisions. *Ibid.*

The Appellate Division therefore reversed the trial court's grant of summary judgment in favor of Reynolds, remanding those claims to the trial court, and affirmed the grant of summary

judgment in favor of Universal. *Ibid.* Reynolds and the Dealerships filed cross-petitions for certification, both of which we granted. 203 *N.J.* 92, 999 *A.*2d 461 (2010).

Because these consolidated appeals present the Court with entirely discrete questions, we consider them separately.

## II.

### *Claims of the Dealerships Against Reynolds*

Reynolds argues that the Appellate Division erred in concluding Reynolds was not "substantially prejudiced" by the Dealerships' failure to comply with the plain dictates of *Rule* 4:5–1(b)(2). First, Reynolds contends that the Appellate Division failed to adequately address the trial court's factual findings about prejudice, overlooking the impact of the destruction of e-mails generated during the *Wilson* action by the Dealerships on Reynolds' ability to mount a defense. Second, Reynolds argues that the Appellate Division's analysis "suggests that *Rule* 4:5–1(b)(2) is meaningless and encourages parties to play games with their disclosure requirements." In particular, Reynolds charges that the appellate panel's approach will permit the Dealerships to profit from their violation of the *Rule* because it will allow them to use this litigation to treble damages already subjected to trebling in *Wilson.*

In response, the Dealerships urge us to affirm the Appellate Division's judgment, arguing that Reynolds has not shown that it has been "substantially prejudiced" by the failure to comply with *Rule* 4:5–1(b)(2) and thus is not entitled to dismissal of this claim.

## A.

Much of the history that forms the backdrop for our discussion is set forth in the Appellate Division's published opinion, as a result of which we need only summarize it. *Rule* 4:5–1(b)(2) was amended as part of changes made in 1998 to the *Rules* governing mandatory joinder. Prior to that time, this Court's approach to joinder of claims and parties had evolved through a series of

decisions. Commonly referred to as the Entire Controversy Doctrine, the essential principle finds its support in our Constitution, *see N.J. Const.* art. VI, § III, ¶ 4 (referring to power of Supreme Court to create rules governing the trial courts to the end "that all matters in controversy between the parties may be completely determined"), and is derived from common law principles.

■ Taken together, those sources express our long-held preference that related claims and matters arising among related parties be adjudicated together rather than in separate, successive, fragmented, or piecemeal litigation. Underlying the Entire Controversy Doctrine are the twin goals of ensuring fairness to parties and achieving economy of judicial resources. As this Court has recognized, "[t]he purposes of the doctrine include the needs of economy and the avoidance of waste, efficiency and the reduction of delay, fairness to parties, and the need for complete and final disposition through the avoidance of 'piecemeal decisions.'" *Cogdell v. Hosp. Ctr. at Orange,* 116 *N.J.* 7, 15, 560 *A.*2d 1169 (1989) (citing 2 *State of New Jersey Constitutional Convention of 1947, Committee on the Judiciary Report* § 11(J) at 1187 (1947)); *accord Oliver v. Ambrose,* 152 *N.J.* 383, 392–93, 705 *A.*2d 742 (1998).

Originally a claim preclusion rule, *see Falcone v. Middlesex Cnty. Med. Soc'y,* 47 *N.J.* 92, 95, 219 *A.*2d 505 (1966), over time, the doctrine evolved to require joinder of parties as well, *see Cogdell, supra,* 116 *N.J.* at 26, 560 *A.*2d 1169, and culminated in the 1990 adoption of *Rule* 4:30A. In its first formulation, *Rule* 4:30A was broad, requiring joinder of claims and parties and imposing preclusion as a penalty to ensure compliance with that mandate.

The reach of the Entire Controversy Doctrine was at its most expansive following the Court's 1995 decisions in *Circle Chevrolet Co. v. Giordano, Halleran & Ciesla, P.C.,* 142 *N.J.* 280, 662 *A.*2d 509 (1995), and its companion trilogy, *see Mortgagelinq Corp. v. Commonwealth Land Title Ins. Co.,* 142 *N.J.* 336, 662 *A.*2d 536

(1995); *Mystic Isle Dev. Corp. v. Perskie & Nehmad, P.C.,* 142 *N.J.* 310, 662 *A.*2d 523 (1995); *DiTrolio v. Antiles,* 142 *N.J.* 253, 662 *A.*2d 494 (1995). Scholarly criticism of the doctrine's growth, however, followed swiftly. *See, e.g.,* Albert L. Cohn & Terri A. Smith, *Practice and Malpractice After Circle Chevrolet: Some Practical Considerations of the Entire Controversy Doctrine,* 28 *Rutgers L.J.* 79, 84 (1996); Geoffrey C. Hazard, Jr., *An Examination Before and Behind the "Entire Controversy" Doctrine,* 28 *Rutgers L.J.* 7, 24 (1996). Eventually the Court moderated its approach by reinterpreting the doctrine as it related to parties and certain claims and, in that context, by directing the Civil Practice Committee to propose revisions to the relevant *Rules.* *See Olds v. Donnelly,* 150 *N.J.* 424, 444–49, 696 *A.*2d 633 (1997). Ultimately, the Court agreed with the Committee's recommendations, adopting two significant changes. First, *Rule* 4:30A was amended to limit its scope to mandatory joinder of claims. Second, *Rule* 4:5–1(b)(2) was adopted to address joinder of parties.[6]

■ The goals of avoiding piecemeal litigation and creating efficiency as related to parties were accomplished by substituting the mechanism of disclosure for the automatic requirement of joinder. That is, a party to any litigation is obligated to reveal the existence of any non-party who should be joined or who might have "potential liability to any party on the basis of the same transactional facts." *R.* 4:5–1(b)(2). The disclosure obligation attaches to each party when filing its first pleading and continues

---

[6] *Rule* 4:5–1(b)(2), as adopted in 1998, was not precisely the one that the Committee had recommended, because the Court substituted the word "inexcusable" in place of the word "egregious" as the standard against which the failure to comply is judged. The Appellate Division concluded that because the Dealerships were advised no later than December 2003 that the notice of rights in the Reynolds forms did not comply with the regulation's required font size as then required by *N.J.A.C.* 13:45A–26B.2(a)(1)(iii), –26B.2(a)(2)(iii), their failure to comply with the *Rule* was inexcusable. *Kent, supra,* 412 *N.J.Super.* at 12, 988 *A.*2d 594. Because the Dealerships did not file a cross-petition on that issue, we need not address the difference, if any, between the words "inexcusable" and "egregious."

thereafter, requiring each to file and serve amended certifications should facts or circumstances change. *Ibid.* The *Rule* demands only disclosure, explicitly leaving it to the court to decide whether to require that notice of the action be given to any non-party identified or to compel that party's joinder. *Ibid.; see R.* 4:29–1(b).

Enforcement of the *Rule* is also left to the court, although the means of doing so are governed, at least in part, by the *Rule* itself. In relevant part, the *Rule* provides:

> If a party fails to comply with its obligations under this rule, the court may impose an appropriate sanction including dismissal of a successive action against a party whose existence was not disclosed or the imposition on the noncomplying party of litigation expenses that could have been avoided by compliance with this rule. A successive action shall not, however, be dismissed for failure of compliance with this rule unless the failure of compliance was inexcusable and the right of the undisclosed party to defend the successive action has been substantially prejudiced by not having been identified in the prior action.

[*R.* 4:5–1(b)(2).]

Although the *Rule* specifies dismissal and imposition of litigation costs as two enforcement mechanisms, they are not the only sanctions available to the court. Rather, the clear language also broadly authorizes the court to "impose an appropriate sanction." *Ibid.* However, in considering whether dismissal is appropriate, the court must comply with the language of the *Rule* that further defines the circumstances in which that sanction is permitted.

Taken together, both *Rule* 4:30A and *Rule* 4:5–1(b)(2) advance the same underlying purposes. As it relates to claims and to parties, they express a strong preference for achieving fairness and economy by avoiding piecemeal or duplicative litigation. Both, however, recognize that the means of accomplishing those goals rests with the court. That is, *Rule* 4:30A requires joinder of claims but grants authority to a trial judge to create a safe harbor in an appropriate case. Similarly, *Rule* 4:5–1(b)(2) requires that names of potentially liable or relevant parties be disclosed to the court, leaving to it the decision about whether to join them or not.

■ The ultimate authority to control the joinder of parties and claims remains with the court; the parties may not choose to withhold related aspects of a claim from consideration, *see, e.g., Hobart Bros. Co. v. Nat'l Union Fire Ins. Co.,* 354 *N.J.Super.* 229, 240–41, 806 *A.*2d 810 (App.Div.2002) (quoting *Oltremare v. ESR Custom Rugs, Inc.,* 330 *N.J.Super.* 310, 315, 749 *A.*2d 862 (App. Div.2000)), nor may they decline to reveal the existence of other parties in an effort to achieve an advantage.

## B.

The debate between Reynolds and the Dealerships centers on whether Reynolds was "substantially prejudiced" by the Dealerships' failure to comply, in the *Wilson* action, with the mandate of *Rule* 4:5–1(b)(2) that Reynolds be identified as a potentially involved party. The trial court agreed with Reynolds that the prejudice to it was substantial, justifying dismissal; the Appellate Division disagreed, concluding that none of the potential prejudice that Reynolds identified was sufficient to support the drastic sanction of preclusion.

Although we have not considered the meaning of the *Rule's* "substantial prejudice" requirement since its adoption, the Appellate Division has done so. In its earliest effort, the court looked to our Tort Claims Act jurisprudence, *see N.J.S.A.* 59:1–1 to :12–3, reasoning that interpretations of the same phrase used in that statute, *see N.J.S.A.* 59:8–9, would provide guidance. *See Mitchell v. Procini,* 331 *N.J.Super.* 445, 454–55, 752 *A.*2d 349 (App.Div. 2000). Using that framework, the court equated "substantial prejudice" with "the loss of witnesses, the loss of evidence, fading memories and the like." *Id.* at 454, 752 *A.*2d 349 (quoting *Blank v. City of Elizabeth,* 318 *N.J.Super.* 106, 114–15, 723 *A.*2d 75 (App.Div.), *aff'd as modified,* 162 *N.J.* 150, 742 *A.*2d 540 (1999)). Applying that definition in the context of a medical malpractice claim first raised after the underlying injury attributed to the defendant dentist had been resolved, the court found no substantial prejudice. *Id.* at 455–56, 752 *A.*2d 349. The court found that

defendant had not suffered "substantial prejudice" because there were medical records from three different doctors who examined the patient after defendant had treated her, because defendant himself had first-hand knowledge of the patient's condition, and because medical malpractice disputes often arise after a patient has pursued treatment that alters his or her condition. *Ibid.; see also Eagan v. Boyarsky,* 158 *N.J.* 632, 643, 731 *A.*2d 28 (1999) (holding that late notice did not cause "substantial prejudice" to defendants in medical malpractice suit because of the availability of medical records).

We need not decide whether the meaning of the phrase "substantial prejudice" in our *Rule* is entirely coextensive with its meaning in the Tort Claims Act, because the purposes to be served by the *Rule* and the statute are not identical. As the record on appeal demonstrates, however, the analysis we have adopted in Tort Claims Act cases provides a useful starting point. The phrase "substantial prejudice" is used in *Rule* 4:5–1(b)(2) as a limitation on the court's exercise of the power of dismissal as a sanction. As a result, the *Rule* is consistent with our general preference for addressing disputes on the merits and reserving dismissal for matters in which those lesser sanctions are inadequate. *See, e.g., Robertet Flavors, Inc. v. Tri–Form Constr., Inc.,* 203 *N.J.* 252, 272–74, 1 *A.*3d 658 (2010) (evaluating sanctions, including dismissal, appropriate to remedy acts of spoliation of evidence); *Abtrax Pharms., Inc. v. Elkins–Sinn, Inc.,* 139 *N.J.* 499, 514, 655 *A.*2d 1368 (1995) (cautioning that " '[s]ince dismissal with prejudice is the ultimate sanction, it will normally be ordered only when no lesser sanction will suffice to erase the prejudice suffered by the non-delinquent party, or when the litigant rather than the attorney was at fault.' ") (quoting *Zaccardi v. Becker,* 88 *N.J.* 245, 253, 440 *A.*2d 1329 (1982)).

### C.

Reynolds points to several sources of prejudice that it contends will inevitably flow from the failure of the Dealerships to comply

with the *Rule's* notice requirement. It argues, in particular, that evidence generated during the course of the *Wilson* litigation has been lost and that the unique way in which the damages provision of the CFA would operate in this action meet the "substantial prejudice" test. Reynolds contends that in the course of the *Wilson* litigation there were thousands of e-mails generated or received by the Dealerships that the Dealerships have destroyed and that the loss of that evidence will unfairly limit Reynolds' ability to defend itself in this dispute. Moreover, Reynolds points out that the failure to comply with the notice rule in favor of a separate litigation has unfairly exposed Reynolds to increased damages and attorneys' fees. That is, Reynolds argues that the Dealerships, by intentionally pursuing this separate claim, hope to force Reynolds to shoulder all of the compensatory losses and the attorneys fees incurred by the Dealerships throughout the *Wilson* litigation, and that the Dealerships now intend to transform that into treble damages under the CFA in this action.

We address those concerns separately, because the first relates to the availability of evidence and proofs needed for Reynolds to defend itself while the second addresses the potential impact of the particular legal framework in which the claims in this litigation have been brought.

■ The evidence relating to the loss or destruction of the e-mails does not rise to the level of substantial prejudice in this context. Although defendant Burt, the principal of the Dealerships, conceded during his deposition that the Dealerships routinely destroyed e-mails and other data throughout the pendency of the *Wilson* litigation, assertedly due to insufficient memory in the system, and although those e-mails potentially contained information relevant to the claim now made against Reynolds, there are several reasons why this loss of evidence falls short of "substantial prejudice."

First, in this litigation the Dealerships will bear the burden of proving that the Reynolds form proximately caused damages to them. Whether seen in the context of a claim for contribution or

indemnification, or as an ascertainable loss within the meaning of the CFA, the burden of proof remains on the Dealerships. As the appellate panel noted, Reynolds will not be bound by the finding of the judge in *Wilson* about a regulatory violation because Reynolds was not a party to that dispute. *See Kent, supra,* 412 *N.J.Super.* at 13, 988 *A.*2d 594. Moreover, the Dealerships will be required to prove how the amounts paid in the *Wilson* settlement can be attributed to the Reynolds form rather than to overcharges for document and registration fees. The latter, presumably, can be calculated with some precision and if they cannot, the Dealerships will bear the loss. Similarly, any claim by the Dealerships arising from attorneys' fees in *Wilson* will need to be proven through an allocation of fees that can be attributed solely to defense of the regulatory claim. As a practical matter, any prejudice will redound, in all likelihood, to the detriment of the Dealerships rather than to Reynolds because they will lack the proofs that those documents might have revealed.

Second, to the extent that the e-mails might have included information favorable to Reynolds, the trial court will be able to utilize all of the usual spoliation remedies, *see Rosenblit v. Zimmerman,* 166 *N.J.* 391, 401–07, 766 *A.*2d 749 (2001), to ensure that the parties are proceeding on a level playing field, *see Robertet, supra,* 203 *N.J.* at 273–74, 1 *A.*3d 658, and to prevent the Dealerships from deriving a benefit from their destruction of that information. In this case, that could include a searching inquiry about whether copies of those e-mails can be retrieved from others who were a party to them, along with the imposition of costs on the Dealerships for that investigation, the utilization of adverse inferences, or such other remedies as the trial court may find advance the interests of justice and fair play. *Ibid.*

Although the prejudice to Reynolds arising from the loss of evidence can be addressed through application of the wide range of spoliation remedies, there is merit to its assertion that because of the way in which the remedies available pursuant to the CFA operate, permitting that cause of action to proceed would meet the

threshold of "substantial prejudice." In essence, Reynolds contends that, had the claims against it been joined in the *Wilson* action, its liability would have been limited to a portion of the overall damages that the Dealerships paid in that settlement, together with a portion of the attorneys' fees associated with the claim against Reynolds for a regulatory violation. Reynolds points out that, by ignoring the *Rule*, the Dealerships intend to argue that all of the damages they paid in the *Wilson* action and all of the attorneys fees they incurred in that matter are attributable to the Reynolds form, and that they hope to be able to recover treble that amount from Reynolds through the vehicle of the CFA. The Dealerships concede that this is precisely their understanding of the way in which the CFA would operate in this circumstance and precisely the result they hope to accomplish.

That conceded plan of attack, in our view, equates with "substantial prejudice" sufficient to require that it be remedied. The suggestion that the CFA was intended to permit a party to flout the requirement of *Rule* 4:5–1(b)(2) in order to create a windfall by essentially trebling damages that were already the subject of trebling in the earlier action or, for that matter, by trebling its attorneys' fees, is one that this Court cannot endorse. Indeed, the ordinary operation of the CFA in this context would work a substantial prejudice to Reynolds simply because it provides for treble damages. It does so because the relevant claim in the underlying *Wilson* action was itself based on the CFA. Had Reynolds been a party in that matter it would have been subjected, appropriately, to treble damages and to attorneys' fees. However, solely as a result of the Dealerships' failure to comply with the *Rule*, were we to permit the Dealerships to proceed with a CFA claim in this matter, we would be exposing Reynolds to a trebling of damages already trebled as well as to a trebling of attorneys' fees. We think it plain that such an approach rises to the level of substantial prejudice.

That does not end our inquiry, however. The complaint in this matter included, along with the CFA claim, a count seeking

contribution. Permitting the Dealerships to pursue that claim will not create the kind of prejudice that the CFA claim, with its trebling penalty, engenders. It will, however, afford the Dealerships the opportunity to recover that portion of the settlement amounts and attorneys' fees fairly attributable to the inadequacies in the Reynolds form. In the contribution claim against Reynolds, the Dealerships will be required to prove what part of the settlement with the *Wilson* plaintiffs and what part of the attorneys' fees were attributable to the Reynolds form's allegedly inadequate font size. In light of the significant claims in *Wilson* relating to overcharges for document fees, and the likely ease with which those claims may be quantified, it may well be that the actual damages fairly attributable to the Reynolds form will not be difficult to determine.[7] Similarly, the Dealerships will have to prove what portion of their attorneys' fees was caused by defending the claim about the Reynolds form, as opposed to the other claims raised by the members of the *Wilson* class.

Certainly, from a systemic perspective, because the claim against Reynolds is essentially one for contribution, it would have been preferable for it to have been addressed in the context of the *Wilson* litigation. That is particularly true because, it would appear, deciding whether the Reynolds form actually violated the regulation would not have complicated the issues being decided in the class action. Evaluating the percentage of the overall damages attributable to that violation would have been far more efficiently addressed in the context of an analysis of the larger set of claims that the *Wilson* plaintiffs asserted against the Dealerships. Divorcing it from the *Wilson* action and proceeding on it as if it were an entirely separate claim raises the specter of the sort of inefficient, piecemeal litigation that the Entire Controversy

---

[7] Indeed, the response by the *Wilson* plaintiffs to the Dealerships' correspondence about the possibility of adding Reynolds as a party suggests that those sums may be modest, as evidenced by their demand that the Dealerships turn over to them all sums offered by Reynolds in addition to the settlement amounts previously agreed upon.

Doctrine and the corollary *Rule* governing notice of related matters and nonparties were designed to eliminate.

That the *Rule* was violated, that the violation was inexcusable, cannot be questioned. Nonetheless, the strong preference of the court system for orderly and efficient adjudication of disputes does not militate in favor of dismissal of the complaint in its entirety. First, the sanction of dismissal would create, in this case, a windfall for Reynolds. To the extent that the form it sold violated the applicable MVSP regulations and to the extent that such a violation was one that the CFA was intended to address, it would be unjust to permit Reynolds to avoid any responsibility to its customer. Second, however, by drawing a distinction between the CFA claim, the continuation of which would reward a party for refusing to abide by *Rule* 4:5–1(b)(2) through exaggerating its damages, and the contribution claim which will fairly compensate it, we can avoid the substantial prejudice to the adversary of the party that violated the *Rule*. To the extent that there may remain other, lesser prejudice relating to loss of evidence, there is a wide array of sanctions available to the trial court to address any injustice. The trial court should not hesitate to impose any and all sanctions it concludes are needed to ensure that a just remedy is achieved between these parties.

## III.

### *The Dealerships' Claims Against Universal*

In their cross-petition for certification, the Dealerships challenge the dismissal of their claims against their insurer, Universal, for defense and indemnity they contend should have been available pursuant to the STEO coverage.

### A.

The Dealerships advance two arguments in support of their assertion that the dismissal of their claims against Universal should be overturned. First, they contend that the trial court and

the Appellate Division failed to consider the "arising out of" language in the policy, overlooking therefore its relationship to the coverage for "any federal, state or local ... truth-in-lending law or truth-in-leasing law," as a result of which both courts applied a stricter standard to the questions of defense and indemnity than was appropriate. Second, the Dealerships maintain that the Appellate Division erred by "switch[ing] the burden of proof agreed to in the insurance contract" by requiring them to prove that the *Wilson* action was in fact a TILA claim, rather than recognizing that they were entitled to coverage based upon showing that the *Wilson* action had a "substantial nexus" to TILA.

Universal responds to those arguments by asserting that the judgment on appeal is completely in accord with the rules of construction that apply to insurance policies. It asserts that both of the arguments raised by the Dealerships suffer from the same flaws. That is, because the *Wilson* complaint was directed solely at the Dealerships' sales practices and made no allegations about lending or leasing practices, the *Wilson* claim is not one for which a defense or indemnity was owed. Regardless of how one reads the "arising out of" language or interprets the "substantial nexus" approach, the *Wilson* claims were not related to any truth-in-lending or truth-in-leasing law. Universal argues, therefore, that it was not obligated to defend or to provide coverage under the STEO policy, and urges us to affirm the Appellate Division's judgment.

### B.

We need not detail all of the well-settled principles relating to an insurer's duty to defend and how courts should evaluate claims relating to that duty. Essential to any evaluation of a claim that an insurer has a duty to defend is a comparison of the factual allegations in the complaint with the coverage language of the policy. *Voorhees v. Preferred Mut. Ins. Co.*, 128 *N.J.* 165, 173, 607 *A.*2d 1255 (1992) (holding that insurer's duty to defend is triggered by allegations in complaint); *see Flomerfelt v. Cardiello*, 202 *N.J.*

432, 444, 997 *A.*2d 991 (2010) (explaining that insurer's duty to defend depends on comparing complaint and insurance policy); *Danek v. Hommer*, 28 *N.J.Super.* 68, 77, 100 *A.*2d 198 (App.Div. 1953) (holding that "complaint should be laid alongside the policy and a determination made as to whether, if the allegations are sustained, the insurer will be required to pay the resulting judgment"), *aff'd o.b.*, 15 *N.J.* 573, 105 *A.*2d 677 (1954).

As we have recently reiterated, "[i]n making that comparison, it is the nature of the claim asserted, rather than the specific details of the incident or the litigation's possible outcome, that governs" the carrier's duty to defend. *Flomerfelt, supra*, 202 *N.J.* at 444, 997 *A.*2d 991 (citing *Ohio Cas. Ins. Co. v. Flanagin*, 44 *N.J.* 504, 512, 210 *A.*2d 221 (1965)). "When the two correspond, the duty to defend arises, irrespective of the claim's actual merit." *Voorhees, supra*, 128 *N.J.* at 173, 607 *A.*2d 1255 (citing *Danek, supra*, 28 *N.J.Super.* at 76–77, 100 *A.*2d 198). Although "claims that are ambiguously pleaded, but potentially covered" are generally read in favor of the insured, *Flomerfelt, supra*, 202 *N.J.* at 444, 997 *A.*2d 991 (citing *Cent. Nat'l Ins. Co. v. Utica Nat'l Ins. Group*, 232 *N.J.Super.* 467, 470, 557 *A.*2d 693 (App.Div.1989)), in the final analysis, the burden of proving that there is a duty to defend rests on the insured, *FileNet Corp. v. Chubb Corp.*, 324 *N.J.Super.* 476, 494, 735 *A.*2d 1203 (Law Div.1997), *aff'd*, 324 *N.J.Super.* 419, 735 *A.*2d 1170 (App.Div.1999).

Therefore, our analysis must begin with the claims asserted in *Wilson*, because only by comparing those claims to the policy's provisions can the coverage question be resolved. In *Wilson*, the class consisted "of all persons or entities who purchased or leased a motor vehicle from" the Dealerships, but the complaint alleged that the Dealerships had "made misrepresentations and committed fraud in their dealings with their customers." That general assertion was further defined to include three specific claims, which were: "overcharging class members for license, title and registration fees and failing to disclose those overcharges"; "charging class members a deceptive and misleading 'Documenta-

ry Fee' "; and using a form that failed to comply with the applicable regulation regarding font size in its explanation of the customers' right to details about those fees. Those factual allegations were tied to two statutes, the CFA and the TCCWNA, and to three parts of the MVSP regulations, *N.J.A.C.* 13:45A–26B.2(a)(1)(iii), 13:45A–26B.2(a)(2)(i),[8] and 13:45A–26B.2(a)(iii).

 In support of their argument that the *Wilson* claims fell within the STEO coverage, the Dealerships contend that the CFA, the TCCWNA, and the MVSP regulations all advance objectives similar to the truth-in-lending and truth-in-leasing laws, with the result that the insurance policies should be understood to provide coverage for the *Wilson* claims. We disagree. Although there may be occasional overlap in the effect of the statutes and regulations, the essential purpose of truth-in-lending and truth-in-leasing laws is to ensure that certain specific information is provided in connection with the extension of credit. TILA, for example, specifies that terms including annual percentage rates, method of determining finance charges, amount subject to the finance charge, total number and amount of payments, and due dates for repayment of the debt all be disclosed. 15 *U.S.C.* §§ 1602(f), 1602(u) (TILA); *see also* 15 *U.S.C.* §§ 1667a, 1667(1) (Consumer Leasing Acts). Several New Jersey statutes are similar examples of laws that are directed to truth-in-lending or truth-in-leasing. *See, e.g.,* Market Rate Consumer Loan Act, *N.J.S.A.* 17:3B–4 to –43; New Jersey Fair Credit Reporting Act, *N.J.S.A.* 56:11–28 to –52; Consumer Protection Leasing Act, *N.J.S.A.* 56:12–60 to –70; Retail Installment Sales Act of 1960, *N.J.S.A.*

---

8 The *Wilson* complaint's reference to *N.J.A.C.* 13:45A–26B.2(a)(2)(i) was part of the basis for relief against the Dealerships, but was in addition to the claims made that the Reynolds form violated the MVSP regulations relating to font size. Like the MVSP regulations on which the claims relating to the Reynolds form were based, in 2009 the requirement that automobile dealers provide consumers with itemized prices for documentary services, formerly embodied in *N.J.A.C.* 13:45A–26B.2(a)(2)(i), was deleted from the regulation and replaced with nearly identical language now found in *N.J.A.C.* 13:45A–26B.3(a)(2). *See* 40 *N.J.R.* 2213(a).

17:16C–1 to –103. By comparison, the statutes and regulations that were in issue in *Wilson* had a far more general purpose, making them only of superficial similarity to the statutes implicated in the STEO coverage.

Moreover, nothing in the *Wilson* complaint raised any claim directed at the Dealerships' credit, leasing, or financing practices. Certainly the generalized reference to a CFA claim would not create a duty to defend under the policy language referring to a claim by a customer "arising out of ... an alleged violation of any federal, state or local ... (2) truth-in-lending or truth-in-leasing law." Nor, when compared to the actual claims asserted in *Wilson*, is there any assertion of a consumer fraud-based claim that related in any way to "truth-in-lending" or "truth-in-leasing" laws. Regardless of how one interprets the "arising out of" language in the policy, unless the statute or the regulations could be understood to be "truth-in-lending or truth-in-leasing" laws, there can be no coverage and thus no obligation to defend.

The precedents cited by the Dealerships in support of their appeal are not to the contrary. *See Psensky v. Am. Honda Finance*, 378 *N.J.Super.* 221, 223, 875 *A.*2d 290 (App.Div.2005) (recognizing that auto maker's financing affiliate's extension of credit implicated truth-in-lending law); *Gross v. TJH Auto. Co.*, 380 *N.J.Super.* 176, 186, 881 *A.*2d 760 (App.Div.2005) (commenting in dicta that *N.J.A.C.* 13:45A–26B.2(a)(2)(i) is analogous to the federal TILA, 15 *U.S.C.A.* § 1601 to 1693(r)). Notwithstanding the dicta in *Gross* about similarities between TILA and the regulation governing font size cited in the *Wilson* complaint, TILA relates to "creditors" that make "material disclosures" to consumers to promote "the informed use of credit," 15 *U.S.C.A.* §§ 1601(a), 1602(f), 1602(u). Because nothing in the *Wilson* complaint related to claims about credit or the extension of credit, those claims did not give rise to a duty to defend with the meaning of the policy language.

The Dealerships' argument that Universal should have provided a defense based on the *Wilson* allegation of a violation of

TCCWNA similarly falls short. That Act does not, as the Dealerships assert, have the same purpose as TILA, which the Dealerships assert would qualify it as a truth-in-lending or truth-in-leasing law. The purpose of the TCCWNA, *N.J.S.A.* 56:12–15, is to prevent deceptive practices in consumer contracts by prohibiting the use of illegal terms or warranties in consumer contracts. By its terms, it encompasses a wider variety of transactions than do truth-in-lending and truth-in-leasing laws. Were we to interpret TCCWNA in the way that the Dealerships' urge us to, we would broaden the insurer's contractual obligation far beyond "truth-in-lending or truth-in-leasing" to any claim that arose under TCCWNA. Taking that approach would create significantly better coverage than that which the Dealerships bargained for and their insurer intended. *See Walker Rogge, Inc. v. Chelsea Title & Guar. Co.*, 116 *N.J.* 517, 529, 562 *A.*2d 208 (1989) (holding that courts "should not write for the insured a better policy of insurance than the one purchased"); *Kampf v. Franklin Life Ins. Co.*, 33 *N.J.* 36, 43, 161 *A.*2d 717 (1960).

Regardless of how broadly we interpret "arising out of" or "substantial nexus" in our analysis of insurance contracts, the coverage question in this appeal turns on the meaning of the policy's reference to "truth-in-lending or truth-in-leasing" laws. Absent a claim in the *Wilson* action that falls within the meaning of that limitation, Universal was not obligated to defend or indemnify. Notwithstanding the Dealerships' assertions that the Wilson action raised such claims, the focus of that complaint was on fees charged to customers regardless of whether they bought or leased; the fees were not associated with the extension of credit which is the hallmark of a "truth-in-lending or truth-in-leasing" law.

As the complaint filed in this matter recognized through its repeated references to vehicle sales, all of the claims raised in *Wilson* rested on an attack on the Dealerships' sales practices, and not on assertions relating to leasing, financing, or extending credit. The *Wilson* complaint, as the trial and appellate courts

concluded, simply cannot be understood to raise a covered claim when compared to the policy's clear language.

### IV.

The judgment of the Appellate Division reversing the grant of summary judgment in favor of defendant Reynolds is affirmed in part and reversed in part. The judgment of the Appellate Division affirming the grant of summary judgment in favor of defendant Universal Underwriters Group is affirmed. The matter is remanded to the trial court for further proceedings consistent with this opinion.

*For affirmance in part/reversal in part/remandment*—Chief Justice RABNER, Justices LaVECCHIA, ALBIN, HOENS, and Judge STERN (temporarily assigned)—5.

*Opposed*—None.

*Not Participating*—Justices LONG and RIVERA–SOTO.