**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5821-17T1

TWIN CITIES MANAGEMENT,
LLC,

      Plaintiff-Appellant/
      Cross-Respondent,

v.

ABID IGBAL and IGGY
MANAGEMENT, LLC,

      Defendants-Respondents/
      Cross-Appellants.

_____

> Argued March 2, 2020 – Decided April 23, 2020
>
> Before Judges Fasciale and Rothstadt.
>
> On appeal from the Superior Court of New Jersey, Law Division, Camden County, Docket No. L-4316-15.
>
> William C. Mac Millan argued the cause for appellant/cross-respondent (Law Offices of Igor Sturm, attorneys; William C. Mac Millan, on the briefs).

Michael James Confusione argued the cause for respondents/cross-appellants (Hegge & Confusione, LLC, attorneys; Michael James Confusione, of counsel and on the brief).

PER CURIAM

Plaintiff Twin Cities Management, LLC (Twin Cities), appeals from a March 27, 2018 judgment entered after a jury found in favor of defendant Abid Iqbal (Iqbal); and two orders dated July 20, 2018, denying plaintiff's motions for a new trial and reimbursement of counsel fees under Rule 4:5-1(b)(2), for Iqbal's and defendant's Iggy Management, LLC (Iggy), failure to disclose a related litigation in New York. Defendants cross-appeal from that part of the judgment stating that defendants had no ownership interest in Twin Cities. We affirm but remand on the fee issue.

Brothers Ashish and Amish Parikh (collectively the Parikhs) and Iqbal dispute ownership of Twin Cities. The Parikhs formed Twin Cities to acquire and operate Popeyes franchise restaurants in Minnesota. The parties' Memorandum of Understanding (MOU) addressed circumstances under which Iqbal could obtain an ownership interest in Twin Cities. After a breakdown in the parties' relationship, plaintiff sought a declaratory judgment that defendants had no ownership interest in Twin Cities or monies owed to them. Defendants filed counterclaims asserting an ownership interest in Twin Cities and claims for

monies owed as profit-sharing and wages. The jury found that: (1) Iqbal had no ownership interest in Twin Cities; and (2) plaintiff owed Iqbal $421,197, the amount Iqbal paid for an ownership interest in the company, plus $10,000 in unpaid salary.

On appeal, plaintiff argues the verdict was against the weight of the evidence, the judge erred by denying its motion for a new trial, and the judge misapplied Rule 4:5-1(b)(2). On cross-appeal, defendants argue the judge erroneously charged the jury by stating Iqbal had the burden of proving oral modifications to the MOU by clear and convincing evidence, and that the judge committed plain error by not sua sponte awarding them pre-judgment interest.

## I.

The Parikhs have been in business together since 2006, owning and operating Popeyes franchise restaurants. They started their business using money loaned to them by their father, who had operated Dunkin Donuts franchises. As of 2011, they operated between eighty-five and ninety restaurants nationwide.

Popeyes approved the Parikhs' franchise application after they satisfied its criteria for financial liquidity and operational experience. After obtaining approval, the Parikhs agreed to operate the restaurants in accordance with

3

Popeyes' standards, understanding that Popeyes would perform periodic audits to ensure compliance and that failing an audit could result in loss of franchise. Iqbal worked for the Parikh's father, who previously employed him as a Dunkin Donuts manager. Iqbal met with the Parikhs and discussed opportunities for working together.

In 2011, Popeyes planned to redevelop some Kentucky Fried Chicken restaurants in Minnesota, and it solicited proposals from top franchisees for this opportunity—referred to as the "Viking Project." The Parikhs submitted a business plan for the Viking Project, and on December 6, 2012, they created Twin Cities, through which they proposed to own and operate the Minnesota restaurants. Each of the restaurants would be its own separate company—owned by Twin Cities—of which the Parikhs were each fifty-percent owners. The Parikhs discussed the Viking Project with Iqbal and Iqbal's friend, Iftikhar Ali (referred to as Gilani), who also worked for the Parikhs' father. The Parikhs offered Iqbal and Gilani the opportunity to jointly operate the Minnesota franchises and become fifteen-percent owners of Twin Cities.

On January 15, 2013, the Parikhs and Iqbal entered into the MOU, which described the conditions under which Iqbal could obtain the fifteen-percent ownership interest and be responsible for the day-to-day operations of the twelve

4

franchised Popeyes locations in Minnesota.[1]  The same day, the Parikhs and Gilani entered into the MOU with the same terms.  The MOU explains the Parikhs' relationship with Popeyes and the costs that the Parikhs incurred on the Viking Project.

> [The Parikh's] are approved franchisees of [Popeyes].  Popeyes is the owner of twelve (12) locations in the state of Minnesota, which are proposed to become "Franchised Restaurant Locations" . . . .  Popeyes has offered to [the Parikhs] the privilege of becoming the operators of the Franchised Restaurant Locations under a lease and/or sublease for each location under certain terms and conditions which have been accepted by the Parikhs.  The Parikhs have paid to [Popeyes] the sum of $750,000[], representing a $12,500[] development fee for each Franchised Restaurant Location, for a total of $150,000[] and a $50,000[] conversion deposit for each Franchised Restaurant Location which totals $600,000[] . . . .  Thereafter, prior to the opening of each Franchised Restaurant Location, a remaining $125,000[] conversion fee and a $30,000[] franchise fee will be due and payable.

> [The Parikhs], for the purpose of this transaction . . . formed [Twin Cities] in which [the Parikhs] each hold a fifty percent (50%) membership interest.  For each of the twelve (12) Franchised Restaurant Locations . . . the Parikhs and/or [Twin Cities] shall form Minnesota limited liability companies each to operate their [Popeyes restaurants] under a lease or sublease agreement with [Popeyes].  Each of the

---

[1]  Initially there were twelve restaurants in Minnesota.  However, the number grew to fourteen.

A-5821-17T1

twelve (12) specific entities shall be a franchisee for that location under a franchise agreement with [Popeyes]. [Twin Cities] shall be the sole member of each specifically formed limited liability company for a Franchised Restaurant Location.

Thereafter, the MOU set forth Iqbal's relationship with the Parikhs and the Viking Project.

Iqbal has requested of the Parikhs the opportunity to become co-owner and co-operator of the Popeyes restaurant at each of the Franchised Restaurant Locations. The Parikhs and [Twin Cities] recognize the need for trusted and efficient management for each of the Popeyes locations in the State of Minnesota. The parties recognize that . . . Iqbal is not currently an approved franchisee of [Popeyes]. It is the joint desire by the Parikhs and by Iqbal to seek the approval of Iqbal as a franchisee of [Popeyes] for the benefit of the Franchised Restaurant Locations. By reason of Iqbal's experience and business know how, the Parikhs have agreed to admit Iqbal as a member in [Twin Cities] provided only if Iqbal is approved as a franchisee, with his admission only taking place after being approved by the franchisor.

Iqbal has requested of the Parikhs the opportunity to acquire a fifteen[-]percent (15%) membership interest in [Twin Cities] and to be admitted as a member, and further has agreed to be the day to day co-operator of the contemplated Popeyes restaurants at the Franchised Restaurant Locations, and [the] Parikhs have agreed to accept the offer of Iqbal, under the specific terms and conditions contained in this MOU.

6

The MOU expressed that all of the recitals under "Background" were the MOU's conditions and provisions. And the MOU set forth Iqbal's financial obligations, and the consequences of him becoming, or not becoming, an approved franchisee.

> 2. Iqbal shall tender to [Twin Cities] the sum of $112,500[] representing fifteen percent (15%) of the amount heretofore paid to [Popeyes] under the above scenario.
>
> 3. At a time prior to the opening of each Franchised Restaurant Location, Iqbal shall tender to [Twin Cities] the sum of $27,000[] representing fifteen percent (15%) of the expenditure for the $125,000[] conversion fee, the $30,000[] franchise fee, and a $25,000[] anticipated expenditure for a SICOM Register System required for each Franchised Restaurant Location.
>
> 4. The tenders by Iqbal shall be retained by [Twin Cities] in escrow until Iqbal is approved by [Popeyes] as a franchisee for each or all of the Franchise Restaurant Locations. Should Iqbal not be approved as a franchisee by [Popeyes], then in that event, the tenders made by Iqbal shall be refunded to Iqbal without interest, and the understanding between them shall terminate and shall become of no legal effect.
>
> 5. Upon approval of Iqbal as a franchisee of [Popeyes] the Operating Agreement of [Twin Cities] shall be amended to reflect the interests of the admitted member.
>
> . . . .

7. The Parikhs and Iqbal specifically agree that if [Popeyes] does not approve Iqbal as a franchisee prior to the opening for business of the first Franchised Restaurant Location, then, in that event the Parikhs or Iqbal shall have the right to terminate this MOU, or in the alternative, continue with the understanding set forth herein until such time as Iqbal is approved as a franchisee. However, Iqbal shall not receive any ownership interest in [Twin Cities] until such time as he is approved as a franchisee by [Popeyes].

In the event the franchisor [Popeyes] declines to approve Iqbal as a franchisee, then upon such declination the sums tendered by Iqbal shall be refunded to Iqbal, without interest, and this Understanding shall terminate, and become null and void and of no further legal effect.

8. The parties to this Agreement recognize that the agreement to admit Iqbal as a member is for the purpose of being a hands-on operating member together with Gilani . . . of the twelve (12) Franchised Restaurant Location. Iqbal covenants and agrees that as a member of [Twin Cities] he will devote his full time as to the operation of each of the Franchised Restaurant Locations for the benefit of [Twin Cities] o[n] a day to day basis. Iqbal further recognizes the importance of [Twin Cities] to be and to remain in good standing with the franchisor [Popeyes], without the privileges granted to [Twin Cities] interrupted, jeopardized or terminated, and he shall fulfill his operational duties conscientiously and in good faith.

[9.] This [MOU] shall be interpreted and enforced under the laws of the State of New Jersey and may only be amended or modified in writing and signed by all the parties.

8

Thus, under the MOUs' terms, Iqbal and Gilani would operate the Minnesota restaurants and become fifteen-percent owners of the franchises, and they would need to pay the Parikhs: $112,500 plus $27,000 per restaurant ($324,000 for twelve restaurants), totaling $436,500.

Three days after executing the MOUs, on January 18, 2013, the Parikhs signed a franchise agreement with Popeyes for a Minnesota restaurant. Pertinent to the present case, the agreement required the franchisor's consent for any transfer of ownership by the franchisee, and it stated that the agreement would be terminated if any transfer occurred without the franchisor's consent. The following month, in February 2013, the Parikhs entered into another agreement with Popeyes, setting forth the Parikhs' financial obligations as to each of the twelve Minnesota restaurants, with the Parikhs' costs corresponding to the percentage costs charged to Iqbal and Gilani under their MOUs.

At trial, Iqbal testified that his agreement with the Parikhs differed from the terms of the written MOU. For example, he testified that his understanding was that he became a part owner of Twin Cities when he executed the MOU. He stated that he was treated as an owner in terms of signing paperwork on behalf of the business and receiving distributions of profits—-which he used to pay the amounts owed under the MOU on a schedule that was different than the

MOU's schedule. Also, he was issued K-1 tax forms, which indicated that he was an owner. Iqbal further testified that, notwithstanding the MOU's language, he did not need to become an approved Popeyes franchisee to be a part owner of Twin Cities. He also said that the Parikhs prevented him from becoming an approved franchisee because they refused to submit the necessary paperwork until he paid the entire capital contribution.

At trial, plaintiff took the position that the parties' relationship was governed by the MOU's terms. As to profit-sharing, the Parikhs admitted that, from the beginning, they paid Iqbal fifteen percent of the Minnesota restaurants' profits as a measure of good faith and in recognition of his moving from New York to Minnesota. Moreover, they admitted that Iqbal was permitted to use the profits for his required capital contributions because he did not have sufficient funds to pay the amounts set forth in the MOU at the times the MOU mandated. However, the Parikhs maintained that they shared profits with numerous employees, either as an incentive for good work or in recognition for good performance, and that they gave K-1s to everyone with whom they shared profits. At his deposition, Ashish Parikh acknowledged that Iqbal should not have received a K-1.

10

As to becoming an approved franchisee, plaintiff maintained that it was Iqbal's responsibility to become an approved Popeyes franchisee, as set forth in the MOU. The Parikhs claimed they reached out to Popeyes to advise the company that Iqbal and Gilani wanted to become franchisees, and Popeyes advised Iqbal and Gilani that they needed to complete applications. However, the Parikhs had no involvement in the applications, and Iqbal never became an approved franchisee. By contrast, Gilani became an approved franchisee in July 2013, after which he became a fifteen-percent owner of Twin Cities, because he additionally paid his share of capital contributions.

After the MOUs' executions, Iqbal and Gilani were trained in Popeyes restaurant operations, as were Iqbal's sons and the Parikhs' relative, Sahill Parikh. Thereafter, these individuals moved to Minnesota and worked to open and manage the Minnesota restaurants. Over time, the Parikhs came to believe Iqbal was not doing a good job managing the restaurants. The restaurants had increasing costs, decreasing revenue, and missing deposits. Iqbal expressed dissatisfaction with the Popeyes brand, and the Parikhs believed Iqbal was spending most of his time in New York and leaving the restaurants' management to others. Popeyes also expressed concern about the Minnesota operations due to failed audits, and it threatened to close one of the restaurants.

11

One of the audits revealed underreporting of sales, which resulted in an underpayment of royalties, and as a result, the Parikhs had to pay Popeyes $49,297. In addition, in 2013, the Parikhs learned that the Minnesota Department of Labor was addressing complaints by restaurant employees. In 2014, they received notice of a class action lawsuit filed with respect to alleged labor law violations at one of the Minnesota restaurants, which resulted in costly legal fees and settlement funds. Iqbal denied the restaurants' poor management. He testified that he worked long hours, and he denied responsibility for the declining profits, failed audits, and labor litigation, and instead blamed others—including Gilani, Sahill Parikh, Popeyes' suppliers, and Popeyes—for problems with the restaurant renovations and the Parikhs' accounting errors.

In July 2015, the Parikhs met with Iqbal and discussed his leaving the business amicably, with a payout of any monies owed to him. Iqbal also wanted out of the business at that time. However, he was unsatisfied with the Parikhs' accounting of what he was owed, and he threatened a lawsuit. The Parikhs claimed they terminated the business relationship with Iqbal on the date of that meeting. But Iqbal asserted he continued to work in the restaurants until mid-February 2016. At trial, the parties agreed that Iqbal was entitled to payment of a certain amount of money—but they disagreed about the amount.

12

Iqbal claimed entitlement to a greater amount of profit distributions from plaintiff than he had been allocated, although the amount he claimed he was owed is difficult to discern from his testimony.[2] As to this issue, he maintained that the Parikhs inappropriately reduced the Minnesota restaurants' reported profits by wrongly charging for certain expenses, such as capital improvements, management fees, and back-office services. He also claimed his profit-sharing was understated because he was charged for money paid to another individual.[3]

Iqbal also claimed entitlement to unpaid wages. However, the amount is unclear from his testimony.[4] It was undisputed that Iqbal received a salary in 2013. But Iqbal pointed to a period between December 11, 2012 and mid-March 2013, when he was in training but not paid. He also claimed he had been promised a salary of $80,000 or $100,000—it was undisputed that he was paid $60,000 per year. Iqbal also claimed he was not paid a salary between 2014 and

---

[2] Defense counsel discussed calculations in his summation, claiming that out of $678,683 in profits, $84,793 was kept, leaving $593,890 paid over to the Parikhs.

[3] On plaintiff's motion for judgment at trial, the judge limited the damages on defendants' breach of contract claim to profits earned through December 31, 2015.

[4] In summation, defense counsel interpreted Iqbal's testimony and provided the jury with calculations of back wages allegedly owed to Iqbal, based upon an $80,000 salary and a $100,000 salary.

A-5821-17T1

mid-February 2016—the time he stopped working at the Minnesota restaurants, but this was disputed.

Specifically, by email dated December 29, 2013, Iqbal told the Parikhs to stop paying salaries to him and Gilani, and the Parikhs complied. Iqbal asserted that he was induced to stop taking a salary because he started working with the Parikhs on another project, involving Dunkin Donuts franchises, as to which he was assured a thirty-percent ownership interest. By contrast, the Parikhs suggested that Iqbal stopped taking a salary so he could receive compensation in other ways, with fewer taxes owed.

First, the Parikhs noted that the non-payment of salaries to Iqbal and Gilani had the effect of increasing the businesses' profits, of which Iqbal received a percentage share without any W-2 deductions. Second, it was undisputed that, starting in 2014, notwithstanding his declining salary, Iqbal began receiving periodic payments from the businesses. The Parikhs characterized these payments as advances on future profit distributions. However, Iqbal characterized these payments as non-recourse loans in lieu of a salary, although he never reported these payments as income. Finally, testimony showed that Iqbal received non-salary through his business, defendant Iggy Management, LLC, which Iqbal formed on December 30, 2013. Thereafter,

14

Iqbal reduced the taxes he owed on these payments to Iggy Management, LLC, by taking deductions for business-related expenses and profit-sharing with his sons.

The Parikhs presented an accounting of monies allegedly paid to Iqbal and monies paid by him towards a potential ownership interest in Twin Cities. Based upon this accounting, they determined that plaintiff owed Iqbal $181,846. More specifically, the Parikhs claimed Iqbal had been paid or was entitled to $411,197 in profit-sharing, which was applied to his capital contributions, including the initial $112,500 payment owed under the MOU.[5] From that amount, the Parikhs deducted $229,351 in distributions made to Iqbal in 2014 and 2015 and monies taken from sales, and reached an amount due of $181,846. Addressing the Parikhs' calculations, Iqbal agreed that $411,197 was applied to his capital contribution to plaintiff, but said it was money he had never received. He further claimed that he paid at least $700,000 toward the Twin Cities deal.[6]

---

[5] Under the MOU, Iqbal needed to pay $112,500, plus $27,000 per restaurant ($324,000 for twelve restaurants), totaling $436,500.

[6] In summation, defense counsel claimed Iqbal was entitled to $593,890 in profit-sharing paid over to the Parikhs, plus $42,853 in wages, totaling $782,943.

II.

We begin by addressing plaintiff's argument that the jury's damages verdict was inconsistent, illogical, and against the weight of the evidence. Plaintiff contends that the jury miscalculated the amount of the damages it awarded to Iqbal. We conclude there is nothing inconsistent, illogical, or irreconcilable about the jury's calculations.

A jury's verdict "is entitled to very considerable respect." Baxter v. Fairmont Food Co., 74 N.J. 588, 597 (1977). In considering whether a jury verdict, including a damages award, is against the weight of the evidence, we should not reverse unless we are clearly convinced, giving due regard to the jury's opportunity to assess the credibility of all evidence, that there has been a miscarriage of justice under the law. R. 2:10-1; Cuevas v. Wentworth Grp., 226 N.J. 480, 501 (2016); Risko v. Thompson Muller Auto. Grp., Inc., 206 N.J. 506, 521-22 (2011); Baxter, 74 N.J. at 597-98; Dolson v. Anastasia, 55 N.J. 2, 6-7 (1969). The court should carefully weigh the evidence, but it should not substitute its judgment for that of the jury. Dolson, 55 N.J. at 6. The object of a reversal would be "to correct clear error or mistake by the jury." Ibid.

The jury answered several questions related to defendants' damages. As to Question One on the verdict sheet, the jury answered "yes" on whether Iqbal

16

paid the initial required payment of $112,500. Answering Question Two, the jury found that defendant paid $298,697 towards the additional required $324,000 payment of $27,000 for each of the twelve franchise restaurants. Answering Question Fourteen, the jury added these numerical responses and found that plaintiff owed Iqbal $411,197 pursuant to the MOU. As to Question Three, the jury concluded that the MOU had been orally modified to permit defendants to pay any remaining money out of his share of profits. Thereafter, answering Question Nine, the jury found that Iqbal was entitled to receive $334,889 in profit-sharing. Answering Question Eleven, the jury found that $234,282 of the profit-sharing was applied as a credit owed under the MOU. And answering Question Ten, the jury found that $100,607 of the profit-sharing was not applied as a credit owed under the MOU. On Questions Twelve and Thirteen, the jury found that Iqbal never received any withdrawals or advances against profit-sharing, nor did he receive any loans from plaintiff. Finally, answering Question Eighteen, the jury concluded that defendants had not been paid the $10,000 in salary that was owed.

Thus, when the jury awarded defendants $411,197 in damages pursuant to the MOU, it reached that amount by adding the $112,500 initial payment Iqbal made (Question One), plus $298,697 Iqbal paid toward the $27,000 per

A-5821-17T1

restaurant that he was obligated to pay (Question Two).  The $411,197 damage award also corresponds to a figure set forth on one of plaintiff's trial exhibits, in which plaintiff calculated the amount it allegedly owed to defendants. Specifically, the jury added:  (1) Contributions made and 2013 profit distributions ($258,522), plus (2) share of profit entitlement for 2014 ($122,260), plus (3) share of profit entitlement for the period of January 1, 2015 through July 13, 2015 ($30,415), totaling $411,197.  Finally, this damages award also corresponded to the testimonies of Ashish Parikh and Iqbal, with both men agreeing that Iqbal contributed at least this amount toward his financial obligation under the MOU.

In denying plaintiff's motion for a new trial, the judge found that the verdict "fell within a reasonable range which a jury could have reached based upon the evidence by both sides in this case," and it did not shock the conscience. The judge found the $411,197 damages award consistent with the total amount the jury found that Iqbal contributed towards an ownership interest in Twin Cities ($112,500 plus $298,697).  As for the award of $10,000 in wages, the judge found that it most likely related to the period in early 2013, when Iqbal testified that he was not being paid.  Finally, as for the other jury calculations on the verdict sheet, the judge noted that the evidence as to payments made or

18

withheld from Iqbal was hotly contested relating to amount and purpose (e.g., profit-sharing, wages, or non-recourse loans), and neither side presented strong evidence on that issue. Thus, the jury made its own calculations, both accepting and rejecting testimony presented by each side, which it was entitled to do.

The evidence supports the jury's calculation of damages. At trial, the parties agreed that Iqbal made at least $411,197 in capital contributions. Plaintiff argued that this amount should be reduced to account for monies Iqbal owed, while Iqbal argued he was entitled to more, based upon plaintiff's alleged failure to properly account for profits and losses, and thus its failure to pay him his fair share of profits and all wages owed. However, the jury was entitled to reject the parties' calculations and resolve the damages amount based upon the amount the parties agreed upon for capital contributions and to reach its own calculation of lost wages. See, e.g., State v. Muhammad, 182 N.J. 551, 577 (2005) (stating that the jury is not bound to believe testimony of any witness). The jury also reasonably found that plaintiff owed Iqbal $10,000 in back pay. The parties agreed that Iqbal was not paid until March 2013, although Iqbal claimed entitlement to wages back to December 2012. The parties also disputed whether Iqbal was compensated for his work in 2014 and thereafter. As the

judge found, the $10,000 figure corresponds closely with what Iqbal alleged plaintiff owed him for his work in 2013.

### III.

Plaintiff argues that a new trial on damages is warranted because defendants' counsel made improper remarks throughout the trial.[7] Plaintiff did not object to all of the comments raised on appeal, particularly those comments that defendants' counsel made in summation. We see no error that warrants the judgment's reversal.

Plaintiff complains that on cross-examination, defense counsel referred to Ashish Parikh as a "very wealthy man." Its counsel immediately objected to this comment, and the judge sustained the objection and advised the jury to "disregard the comments of counsel." We have no reason to believe that the jury did not follow that instruction.

Plaintiff complains that, in a move orchestrated by defense counsel, Iqbal falsely testified that the Parikhs had criminal records. Its counsel immediately objected to this testimony and moved for a mistrial. The judge denied the motion

---

[7] We address the comments about which plaintiff complains in its initial appellate brief. It raised additional comments in its reply brief, however, it is inappropriate to raise new issues in a reply brief. Borough of Berlin v. Remington & Vernick Eng'rs, 337 N.J. Super. 590, 596 (App. Div. 2001).

but sustained the objection and issued a cautionary instruction to the jury, stating: "[T]here is absolutely no evidence in this case that any of the witnesses or parties have any criminal record[s]. And you are to disregard any testimony to the contrary in this case." The jury followed that instruction.

The judge rejected plaintiff's contention that the comments, including those made by defendants' counsel in summation to which there was no objection, did not warrant a new trial. The judge stated:

> Defense counsel here did on at least a couple of occasions go beyond the permissible bounds of argument, impermissibly expressing his personal belief. No objection was raised at the time this occurred, which would have allowed the [c]ourt to give an appropriate cautionary instruction at that time.
>
> The comments, which were relatively brief and fleeting, the [c]ourt notes, were extremely unlikely to have any prejudicial impact on the jury.
>
> More importantly, to ensure that there was no prejudicial effect, the [c]ourt emphasized in the jury charge the caution that the statements and comments of counsel were not evidence.
>
> It's the [c]ourt's belief that this eliminated any potential prejudice as a result of the comments by defense counsel.
>
> The [c]ourt also notes that there's nothing here about the verdict in this case which shocks the conscience.

21

Rather, the verdict fell within a reasonable range which a jury could have reached based upon the evidence by both sides in this case.

Counsel are expected to zealously advocate for their clients. At the same time, they may not misrepresent the evidence, and "it is improper for an attorney to make derisive statements about parties, their counsel, or their witnesses." Szczecina v. PV Holding Corp., 414 N.J. Super. 173, 178 (App. Div. 2010); accord RPC 3.4(e); Risko, 206 N.J. at 522-23; Geler v. Akawie, 358 N.J. Super. 437, 463-64, 467 (App. Div. 2003); Rodd v. Raritan Radiologic Assocs., P.A., 373 N.J. Super. 154, 171 (App. Div. 2004).

Here, the remarks that plaintiff complains of on appeal were either struck from the record upon plaintiff's counsel's objections or were not objected to by plaintiff's counsel at trial, indicating that counsel did not deem them prejudicial. Risko, 206 N.J. at 523. As to the comments in summation, the judge instructed the jurors that counsel's arguments were not evidence, and they must rely upon their own review of the record in reaching their verdict. The jury is presumed to have followed the judge's instructions. State v. Santamaria, 236 N.J. 390, 412-13 (2019).

IV.

Plaintiff argues that the judge erred by denying its post-trial motion for counsel fees and costs based upon Iqbal's failure to disclose related litigation in New York, as required under Rule 4:5-1(b)(2).  Defendants' appellate counsel concedes that trial counsel should have reported the New York litigation, but argues that the judge did not abuse his discretion in declining to award counsel fees.  On this issue, we reverse and remand for further proceedings consistent with this opinion.

In the New York litigation, Iqbal sought the same relief he seeks in the present litigation, based upon the same set of facts.  The named defendants in the New York litigation were Ashish Parikh, Amish Parikh, and Prabodh Parikh (the Parikhs' father), individually and as owners of the Parikh Network.  Plaintiff filed this complaint in November 2015, more than two years before Iqbal filed the New York litigation.  Additionally, this case was tried in March 2018, three months after Iqbal filed the New York litigation.

The judge found that in the New York action, Iqbal sought the same relief in the present action, based upon the same set of facts.  Defense counsel clearly violated Rule 4:5-1(b)(2) by failing to disclose the New York litigation.  In denying the motion, the judge stated:

It's crystal clear to the [c]ourt that . . . defendant violated the provisions of <u>Rule</u> 4:5-1(b)(2), failing to notify the [c]ourt or the opposing party, in . . . this action, the pendency of the New York suit.

. . . .

With respect to the second portion of the relief sought by [p]laintiff, the [c]ourt concludes that it does not have jurisdiction to enter a decision with respect to an action pending in New York.

The [c]ourt happens to agree that had the same action been filed in this [c]ourt, both the entire controversy and the doctrine of collateral estoppel would bar the New York suit in its entirety.

The problem is that New Jersey doesn't have the power to order such a finding by the New York courts, and that's an application that must be addressed in the New York courts.

<u>Rule</u> 4:5-1(b)(2) does provide that the [c]ourt may impose an appropriate sanction, including dismissal of the successive action. Obviously . . . the sanction of dismissal of the successive action is not something this [c]ourt can address since this [c]ourt doesn't have jurisdiction over that action.

The conduct of counsel for defendant here is the type of practice condemned by the Appellate Division in [<u>Simmermon v. Dryvit Systems, Inc.</u>, 196 N.J. 316, 334 (2008)].

The Appellate Division there, however, recognized that in dealing with cases pending in different jurisdictions, here the other jurisdiction, New

24

> York, must make the decisions and not a New Jersey court.
>
> The improper conduct here appears to have been a tactical decision seeking to gain an unfair advantage. Nevertheless, it does not appear to have resulted in any additional costs being incurred in the New Jersey action.
>
> Rather, the additional costs being incurred by [p]laintiff, or the principals thereof, are being incurred . . . in the New York action and not in the New Jersey action.
>
> The [c]ourt also notes that while the Parikhs . . . were principals and testified here, of Twin Cities, they were not parties here. Any compensation for expenses being incurred by those individuals it seems to the [c]ourt must be addressed by the New Jersey courts.
>
> Accordingly, because the successive action is not pending in New Jersey, the [c]ourt will deny the motion.

We review the judge's ruling for an abuse of discretion. Karpovich v. Barbarula, 150 N.J. 473, 483 (1997) (holding that violation of Rule 4:5-1(b)(2) does not mandate dismissal of second litigation; "[r]ather, a court must exercise its discretion and consider the purposes of the entire controversy doctrine before barring a subsequent action").

Rule 4:5-1(b)(2) requires disclosure of related actions. It provides, in pertinent part:

Each party shall include with the first pleading a certification as to whether the matter in controversy is the subject of any other action pending in any court . . . or whether any other action . . . is contemplated; and, if so, the certification shall identify such actions and all parties thereto. Further, each party shall disclose in the certification the names of any non-party who should be joined in the action . . . or who is subject to joinder . . . because of potential liability to any party on the basis of the same transactional facts.

Moreover, the <u>Rule</u>'s disclosure obligation is a continuing one: "Each party shall have a continuing obligation during the course of the litigation to file and serve on all other parties and with the court an amended certification if there is a change in the facts stated in the original certification[.]" <u>R.</u> 4:5-1(b)(2).

In terms of sanctions for failing to make the required disclosure, the <u>Rule</u> provides:

<u>If a party fails to comply with its obligations under this rule, the court may impose an appropriate sanction including dismissal of a successive action against a party whose existence was not disclosed or the imposition on the noncomplying party of litigation expenses that could have been avoided by compliance with this rule</u>. A successive action shall not, however, be dismissed for failure of compliance with this rule unless the failure of compliance was inexcusable and the right of the undisclosed party to defend the successive action has been substantially prejudiced by not having been identified in the prior action.

[<u>Ibid.</u> (emphasis added).]

The courts are charged with enforcing this Rule, the goal of which is to avoid "piecemeal litigation." Kent Motor Cars, Inc. v. Reynolds & Reynolds, Co., 207 N.J. 428, 444-45 (2011); see also Gelber v. Zito P'ship, 147 N.J. 561, 567-68 (1997). "Although the Rule specifies dismissal and imposition of litigation costs as two enforcement mechanisms, they are not the only sanctions available to the court. Rather, the clear language also broadly authorizes the court to 'impose an appropriate sanction.'" Kent Motor Cars, 207 N.J. at 445 (quoting R. 4:5-1(b)(2)).

For example, in Simmermon, 196 N.J. at 334-35, the Court found that the defendant made a tactical decision to violate Rule 4:5-1(b)(2) by not notifying the court of a class action litigation pending in Tennessee until the opt-out deadline expired and the settlement was approved, thereby precluding the plaintiff's New Jersey litigation. The Court held that the defendant's violation of Rule 4:5-1(b)(2) did not warrant a refusal to give full faith and credit to the judgment in the class action suit. Id. at 336. Instead, the Court found that the plaintiff should seek relief from the judgment in Tennessee. Id. at 336-38.

On the other hand, the Court found that it was "only fair that [the defendant] be held responsible for those litigation expenses, including attorneys'

fees, that would not have been incurred by [the] plaintiff had [the defendant] filed a timely certification." Id. at 335. More specifically, the Court stated:

> [The defendant] will be responsible for all litigation expenses, including attorneys' fees, incurred by [the] plaintiff in seeking relief from the Tennessee judgment. If [the] plaintiff applies for relief in Tennessee and is not excluded as a class member from the settlement and the Tennessee judgment remains in effect, then the Law Division in this state must give preclusive effect to that judgment. In such case, [the defendant] will also be responsible for all litigation expenses, including attorneys' fees, incurred by [the] plaintiff from the time it breached Rule 4:5-1(b)(2)—March 15, 2002, the date that [the defendant] filed an answer without the required certification.
>
> If Tennessee excludes [the] plaintiff from the class action settlement, he then may proceed with his remaining New Jersey claims. In such case, because the appeals to the Appellate Division and this Court clearly could have been avoided had [the defendant] filed the required Rule 4:5-1(b)(2) certification, the trial [judge] is directed to impose the litigation expenses, including attorneys' fees, incurred by [the] plaintiff in those appeals. The trial [judge] will also determine all other such litigation expenses incurred by [the] plaintiff at the pretrial stage that are attributable to the violation of the [Rule]. Under that scenario, [the defendant] would not be liable for litigation expenses for pretrial work, such as depositions and motions, related to the substantive claims advanced by [the] plaintiff.
>
> [Id. at 338-39.]

A-5821-17T1

See also Potomac Ins. Co. of Ill. ex rel. OneBeacon Ins. Co. v. Pa. Mfrs. Ass'n Ins. Co., 425 N.J. Super. 305, 326-28 (App. Div. 2012) (affirming verdict in second litigation, for defense costs in underlying action, because in the underlying action "the parties and their attorneys entered into an intentionally ambiguous agreement and both sides failed to comply with [Rule 4:5-1(b)(2)]").

Here, in denying sanctions, the judge seemed to be under the misapprehension that the only sanction available was dismissal of the New York action, which it did not have jurisdiction to grant. However, that clearly was not the case. Rule 4:5-1(b)(2) permits the judge to determine an appropriate sanction depending upon the circumstances. In this case, for example, the judge could have awarded plaintiff the counsel fees and costs associated with the motion for sanctions. Moreover, consistent with Simmermon, the judge could have ruled that, if plaintiff moved to dismiss the New York litigation on res judicata and entire controversy grounds, and the New York court denied the motion, then the judge would consider the New York court's decision and defendant would potentially be held responsible for plaintiff's litigation costs in New Jersey from the date of defendant's violation of the Rule—at the very least, the date the complaint was filed in New York. We therefore reverse and remand for the judge to reconsider the sanction question.

## V.

In their cross-appeal, defendants contend the judge erred by instructing the jury that oral modifications to a contract must be proven by clear and convincing evidence. They argue, therefore, that a new trial should be ordered on Iqbal's claim of a fifteen-percent ownership interest in Twin Cities. We conclude the judge erred, but this error does not warrant the judgment's reversal because the jury determined that Iqbal had not made the required financial contributions to become a fifteen-percent owner of Twin Cities. Therefore, his claim to an ownership interest in Twin Cities fails, regardless of the error.

Plaintiff's counsel argued that a clear and convincing standard applied to modifications of a written contract, where the written contract provides only for written modifications, not oral modifications. Defense counsel objected, stating that the case law plaintiff cited to only talked about "clear conduct," and "[n]ot necessarily clear and convincing evidence." However, defense counsel also stated: "[I]f that's what the law is, then I have to live with it. But I don't have to just say okay because they say so." The judge agreed with plaintiff's argument and gave the clear and convincing evidence charge as requested.

The judge charged the jury, in pertinent part, as follows:

> With regard to the claimed oral modification of
> the written contract, which is the [MOU], it is the

obligation of the party claiming a modification to
prove those allegations by clear and convincing
evidence.  Clear and convincing evidence is evidence
that produces in your minds a firm belief or conviction
that the allegations sought to be proved by the
evidence are true.  It is evidence so clear, direct,
weighty in terms of quality, and convincing as to
cause you to come to a clear conviction of the truth of
the precise facts in issue.  The clear and convincing
standard of proof requires that the result shall not be
reached by a mere balancing or doubts or
probabilities, but rather by clear evidence which
causes you to be convinced that the allegations sought
to be proved are true.

Thereafter, the judge repeated the clear and convincing evidence standard when reciting the elements of defendant's cause of action for breach of an oral modification of the contract, and as to defendant's specific allegation of an oral modification.

In Question Three on the verdict sheet, the jury found that Iqbal proved one oral modification of his contract with plaintiff, that is, for him to make his required payments through profit distributions.  Plaintiff conceded this modification at trial.  But the jury also found, as reflected on the verdict sheet:

4. Under the terms of the [MOU], was [Iqbal]
required to be approved as a franchisee by [Popeyes]
before he was permitted to receive a [fifteen-percent]
ownership interest in [Twin Cities]?

YES __X__                No _____                (7-1)

5. Was [Iqbal] ever approved as a franchisee of [Popeye's]?

YES _____          No __X__          (8-0)


6. Did the conduct of [Twin Cities] prevent [Iqbal] from becoming an approved franchisee of [Popeye's]?

YES _____          No __X__          (7-1)

. . . .


8. Did [Iqbal] comply with all conditions required for him to receive [fifteen-percent] ownership interest in [Twin Cities] in accordance with the terms of the [MOU] and any agreed upon modifications to that agreement?

YES _____          No __X__          (8-0)

. . . .


15. Did [Twin Cities] breach the [MOU] to provide [Iqbal] with a [fifteen-percent] ownership in [Twin Cities]?

YES _____          No __X__          (7-1)

"[I]t is fundamental that the jury charge should set forth in clear understandable language the law that applies to the issues in the case." Toto v. Ensuar, 196 N.J. 134, 144 (2008); accord Estate of Kotsovska ex rel. Kotsovska v. Liebman, 221 N.J. 568, 591 (2015); Mogull v. CB Commercial Real Estate Grp., 162 N.J. 449, 464 (2000). In considering a trial judge's jury charge, a

reviewing court must read the charge as a whole to determine if it was correct. Toto, 196 N.J. at 144; Sons of Thunder, Inc. v. Borden, Inc., 148 N.J. 396, 418 (1997). We do not reverse "where the charge adequately conveys the law and does not confuse or mislead the jury." Sons of Thunder, 148 N.J. at 418. However, even erroneous jury instructions do not require reversal where the instructions were incapable of producing an unjust result or prejudicing substantial rights. Ibid.; accord Toto, 196 N.J. at 144.

In general, a contract is formed where there is an offer and acceptance between the parties. Morton v. 4 Orchard Land Tr., 180 N.J. 118, 129-30 (2004). After formation, the contracting parties "may, by mutual assent, modify it." County of Morris v. Fauver, 153 N.J. 80, 99 (1998). "A contract modification is 'a change in one or more respects which introduces new elements into the details of a contract and cancels others but leaves the general purpose and effect undisturbed.'" Wells Reit II-80 Park Plaza, LLC v. Dir., Div. of Taxation, 414 N.J. Super. 453, 466 (App. Div. 2010) (quoting Int'l Bus. Lists, Inc. v. Am. Tel. & Tel. Co., 147 F.3d 636, 641 (7th Cir. 1998)).

Generally, modifications to a written contract are not required to be made in writing. To the contrary, a "modification can be proved by an explicit agreement to modify, or . . . by the actions and conduct of the parties, so long as

the intention to modify is mutual and clear." County of Morris, 153 N.J. at 99; accord Wells Reit, 414 N.J. Super. at 466; DeAngelis v. Rose, 320 N.J. Super. 263, 280 (App. Div. 1999). However, an agreement to modify a contract "must be based upon new or additional consideration." County of Morris, 153 N.J. at 100. The consideration need not be significant; whatever consideration the parties agree to is sufficient. Oscar v. Simeonidis, 352 N.J. Super. 476, 485 (App. Div. 2002).

The model jury charge on contract modifications does not set forth a clear and convincing standard of proof. Model Jury Charges (Civil), 4.10I "Bilateral Contracts – Modification" (approved May 1998). However, the clear and convincing standard of proof applies to a limited number of contract claims, including where a statute requires a contract for the transfer of real property be in writing. See, e.g., N.J.S.A. 25:1-12; N.J.S.A. 25:1-13; Morton, 180 N.J. at 125-26; Tiedemann v. Cozine, 297 N.J. Super. 579, 582 (App. Div. 1997); Aiello v. Knoll Golf Club, 64 N.J. Super. 156, 160-61 (App. Div. 1960). See also N.J.S.A. 2A:81-2 (requiring proof by clear and convincing evidence to establish agreement with individual who is mentally incapacitated).

On appeal, as it did before the judge, plaintiff relies on these land transfer/statute of fraud cases. Plaintiff also relies on Home Owners

Construction Co. v. Borough of Glen Rock, 34 N.J. 305, 316-17 (1961), a public construction contract case, in which the Court required clear and convincing proof for oral modifications of the contracted work. However, that case did not purport to establish a general rule requiring clear and convincing proof for all alleged oral modifications of written contracts.

"As a general rule, the preponderance of the evidence standard applies in civil actions." Liberty Mut. Ins. Co. v. Land, 186 N.J. 163, 169 (2006). The clear and convincing evidence standard is more stringent than the preponderance of the evidence standard. It "establishes a standard of proof falling somewhere between the ordinary civil and criminal standards" of preponderance of the evidence and beyond a reasonable doubt. Aiello, 64 N.J. Super. at 162; accord Land, 186 N.J. at 169-70. Evidence is clear and convincing when it "produce[s] in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Aiello, 64 N.J. Super. at 162.

Here, there was no statutory requirement that the parties' contract be in writing, nor was there any statutory requirement imposing a clear and convincing evidence standard for oral contract formation or modification. Therefore, the judge erred by charging the jury that the MOU's oral modifications must be proven by clear and convincing evidence. Absent a clear

and convincing evidence standard, the jury might have found in defendants' favor on the oral modification claim. Typically, that would require the judgment's reversal and a new trial.

On the record presented, however, we conclude the error was harmless in light of the jury's finding that Iqbal had not fulfilled the conditions necessary to become a fifteen-percent owner of Twin Cities. It was undisputed that one of those conditions was making the necessary financial contributions, and the jury concluded that Iqbal had contributed less than the required amount. Thus, even if the jury found that the contract had been orally modified to eliminate this requirement of becoming an approved Popeyes franchisee, Iqbal still was not entitled to a fifteen-percent ownership interest in Twin Cities because the jury found he had not made the required financial contributions.

Furthermore, the alleged oral modification is not supported by the evidence at trial, even applying a preponderance of the evidence standard. Iqbal presented no evidence that plaintiff agreed to an oral modification of the MOU, such that he could become a part owner of Twin Cities without becoming an approved Popeyes franchisee, nor did he present any evidence as to an exchange of new or additional consideration for this alleged oral modification of the MOU. Thus, he did not provide the required evidence for an oral modification

of contract claim, no matter what standard of proof is applied.  Plaintiff is correct, as well, that defendants produced no evidence as to damages, that is, the value of a fifteen-percent ownership interest in Twin Cities.

Indeed, Iqbal did not rely on the contract modification theory to obtain relief.  Iqbal testified that he was an owner from the start based upon his understanding of the agreement and by how he was treated.  In other parts of his testimony, he seemed to admit that it was his contractual obligation to become an approved Popeyes franchisee; however, he maintained that the Parikhs made it impossible for him to become one because they did not submit his application.  And defense counsel did not argue the elements of a contract modification claim.  Rather, defense counsel pursued theories of detrimental reliance on the Parikhs' promises to submit the franchise application, and excusal of a contract condition due to the Parikhs' misconduct in not submitting the application.  The verdict sheet, however, reflects that the jury rejected defendants' claim that plaintiff prevented Iqbal from becoming an approved franchisee.

Finally, we note that Iqbal's oral modification allegation obviously implicates the rights of a third party—Popeyes.  Iqbal clearly understood that Popeyes' rights were implicated because the terms of his written agreement with Twin Cities referenced Popeyes' ongoing interest in all of the Minnesota

37

restaurants. However, pursuant to the Parikhs' franchise agreement with Popeyes, the Parikhs could not transfer ownership of Twin Cities without Popeyes' consent. Indeed, the franchise agreement provides that the agreement would be terminated if any transfer occurred without Popeyes' consent.

At trial, Iqbal presented testimony that other individuals were part owners of Twin Cities, without being approved franchisees. However, he presented no evidence that Popeyes consented to the Parikhs' transferring to him a fifteen-percent ownership interest in Twin Cities. Therefore, even if Iqbal proved a modification of his written agreement with Twin Cities, such that he did not have to be an approved franchisee in order to be a part owner of Twin Cities (which he did not), he still did not prove any right to a fifteen-percent ownership of Twin Cities because he did not show that Popeyes consented to such transfer.

## VI.

In their cross-appeal, defendants contend the judge committed plain error by not sua sponte granting them prejudgment interest on the award of damages. Our review of an award of prejudgment interest, and the calculation of that amount, is for an abuse of discretion. County of Essex v. First Union Nat'l Bank, 186 N.J. 46, 61 (2006); P.F.I., Inc. v. Kulis, 363 N.J. Super. 292, 301 (App. Div. 2003). We see no abuse.

A-5821-17T1

Prejudgment interest on contract and equitable claims is a matter of equity. Litton Indus., Inc. v. IMO Indus., Inc., 200 N.J. 372, 390 (2009). In such cases, prejudgment interest is meant to cover the period of time during which the defendant had use of the amount in question, while the plaintiff was entitled to have it. Ibid.

Here, defendants did not request prejudgment interest before the trial judge, either in their counterclaim or in a post-trial motion. Moreover, since prejudgment interest is a discretionary decision in this contract action, the judge was under no obligation to order prejudgment interest sua sponte, and there was no abuse of discretion. On remand, defendants may raise the pre-judgment issue by filing an appropriate motion.

We affirm the judgment. We remand for further proceedings on the sanction and pre-judgment issues. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION